COMMONWEALTH *vs.* DAVID M. AZAR.

Middlesex. October 1, 2001. - January 23, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Homicide. Malice. Practice, Criminal,* Instructions to jury, Assistance of counsel, New trial. *Constitutional Law,* Assistance of counsel.

In a murder case, the judge's erroneous instructions to the jury on the third prong of malice, a contested element of the crime charged, created a substantial risk of a miscarriage of justice requiring a new trial, where the defining element of the crime was misstated, the evidence did not require a finding of malice under the correct definition, the prosecutor's argument expressly invited the jury to proceed under the erroneous definition, and there was no reasonable tactical basis for the failure of defense counsel to object to the mistaken and unfavorable (to the defendant) definition of an element of the crime. [681-690]

INDICTMENT found and returned in the Superior Court Department on December 15, 1988.

Following review by the Appeals Court, 32 Mass. App. Ct. 290 (1992), a motion for a new trial, filed on November 11, 1998, was heard by *Hiller B. Zobel,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Richard J. Fallon* for the defendant.

*Marguerite T. Grant,* Assistant District Attorney (*Elizabeth A. Keeley,* Assistant District Attorney, with her) for the Commonwealth.

MARSHALL, C.J. When a criminal defendant's conviction has been affirmed on direct appeal and the defendant thereafter moves for a new trial, raising for the first time an issue that could have been raised at the trial or on appeal, interests of finality and the fair and efficient administration of justice must be weighed in addition to "the ever-present concern that justice not miscarry for the defendant." *Commonwealth* v. *Curtis,* 417 Mass. 619, 623 (1994). Our recent opinions, in particular, have

described "society's justified interest in finality that has long been implicit, and sometimes explicit, in our announcements that any late-arriving issue will prevail only if the issue presents a *substantial* risk of a miscarriage of justice" (emphasis in original). *Commonwealth* v. *LeFave*, 430 Mass. 169, 175 (1999). We hold in this case that the judge's erroneous instructions to the jury on a contested element of the crime charged did create a substantial risk of a miscarriage of justice, and that a new trial is therefore required.

*Procedural history.* The defendant was tried in 1989 on an indictment charging murder in the first degree on a theory of extreme atrocity or cruelty. The alleged victim was his infant daughter. He was convicted of murder in the second degree. His conviction was affirmed on appeal. *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290 (1992). He was represented by the same counsel both at trial and on appeal.

In 1998, the defendant filed his first postappeal motion for a new trial, challenging the judge's instructions to the jury on the so-called third prong of malice. Specifically, he alleged that the instructions incorrectly included grievous bodily harm language in the definition of the third prong of malice, and that his trial counsel was ineffective in failing to object to that error. The defendant had not raised this issue previously. The trial judge, without a hearing, made a ruling that, in effect, denied the motion.[1] The defendant appealed, and the Appeals Court reversed and ordered a new trial. *Commonwealth* v. *Azar*, 50 Mass. App. Ct. 767 (2001). We granted the Commonwealth's application for further appellate review.

---

[1]The judge endorsed the motion as follows: "Defendant could have raised this issue in his original appeal or in his application for further appellate review. I do not believe it is in the interests of justice to re-open the appellate agenda. Nor do I believe a lesser verdict is more consonant with the interests of justice. Motion, therefore, not acted on." The penultimate sentence apparently was in response to the fact that the defendant had requested, in the alternative to a new trial, a reduction in the degree of the verdict, pursuant to Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979).

The defendant moved for reconsideration of this ruling. He reiterated that he was represented by the same attorney at trial and on direct appeal, and he claimed, therefore, that he was not barred from raising his claim of counsel's ineffectiveness for the first time in his postappeal motion for a new trial. The judge denied the motion without a hearing.

*Summary of pertinent evidence.* In November, 1988, the defendant resided with his wife and their three children in Sudbury. The oldest child was twenty-one months old. The alleged victim and her twin brother were approximately four months old.

The defendant was at home with the children on the morning of Sunday, November 27, when the events occurred that gave rise to this prosecution. His wife was working at the family's store in Cambridge. There was evidence that, in the late morning, the defendant telephoned her to report that there was a problem with their daughter, who appeared not to be breathing. His wife telephoned her sister and parents, who lived in Wayland. In response, they traveled to the Azars' home in Sudbury where they found the child lying motionless in her crib. Emergency help was summoned. The wife's sister, the chief of the Sudbury fire department, and an emergency medical technician all attempted unsuccessfully to resuscitate the child.

It is undisputed that the child somehow suffered a variety of physical injuries, both on the morning of November 27 and earlier, which we shall describe. There was conflicting evidence presented at trial, however, as to the precise nature and extent of her injuries, and as to how they may have occurred. The Commonwealth's evidence tended to demonstrate that her injuries were severe, and that they had been intentionally inflicted by the defendant. The defendant's evidence tended to establish that the injuries were somewhat less severe than the Commonwealth claimed, and, in any event, had been caused accidentally.

The defendant testified as follows. During the morning of November 27, his daughter fell asleep, and he placed her in her crib. A short time later, he checked on her because he thought that he had heard noises coming from the crib. He found her lying "very still" and picked her up. The child was "limp." The defendant testified that he "blew in her face to try to get a reaction out of her, [but] there was no reaction at all." He "shook her and started screaming her name." He "grabbed her around the neck," opened her mouth, and "blew in her mouth." The child "jumped" and "opened her eyes very startled." The defendant testified that he "was really panicked" at this point.

Holding the child tightly against his shoulder, he ran to the telephone in the kitchen to call his wife. As he reached for the telephone, his daughter flew out of his arms and hit her head on the kitchen counter top. The defendant then called his wife at their store and told her that the child "wasn't breathing" and that he needed some help. The child was making "gasping" noises, and the defendant "was pushing up and down on her chest" in an attempt to resuscitate her.

According to the defendant, his daughter began breathing again. He told his wife that he "needed help" and "wanted to take care of" their daughter. She replied that she would telephone him back, which she did approximately twenty minutes later. She told him that she had telephoned her sister and parents, and that "they were going to come over and help [him]." About ten minutes later, the defendant placed his daughter back in her crib so that he could attend to the other two children, who were "acting up." That is where the defendant's in-laws found the child when they arrived.

An autopsy revealed that the child had several relatively fresh bruises under her chin and on her chest, upper back, and left buttock, and a "somewhat star-shaped reddish discoloration" above her left ankle. Five ribs were fractured but showed signs of healing, indicating that the fractures had occurred one to six weeks before November 27. The child also had fractures on her leg bones. None of these injuries caused the child's death.

The autopsy also revealed pinkish discoloration on the right side of the child's head, hemorrhaging and fresh bruising under the scalp, an accumulation of at least one-quarter inch of blood in an area measuring five by six inches, and a four-inch C-shaped fracture on the right side of her skull. The medical examiner who performed the autopsy, Dr. Joann Richmond, testified that, in her opinion, these injuries were caused by "a very severe force, such as being hit on a very broad, flat surface, or being hit with something that had a broad flat surface." There also was evidence that the child's brain was swollen and flattened, although the degree of the swelling was disputed. Dr. Richmond testified that the brain was moderately swollen, and that the swelling was "a result of a severe injury to the head."

There was no evidence of any injury to the brain other than swelling. The medical examiner characterized the child as "a battered child who died of violent trauma to the head and brain."

Considering the child's head injuries and the star-shaped discoloration above the left ankle, Dr. Richmond theorized that the child had been "held tightly around the legs above the ankles . . . and . . . swung with a force to strike an object on the right side of her head." Specifically, she testified that the injuries were consistent with the child's head having been swung into a wall, a headboard of a bed, or a counter top. She likened the amount of force needed to cause these injuries to the force that occurs when a child falls from a second-story window and onto her head, or is forcibly propelled into a dashboard in an automobile accident.

In addition to the medical examiner's testimony, the Commonwealth also presented medical testimony from a pediatric radiologist, Dr. Paul Kleinman, who was qualified as an expert on child abuse. He stated that the various fractures on the child's leg bones were "a result of a severe, massive degree of force being applied, either as a child is gripped by the extremities, or as the child is held by the chest and shaken." He stated that the rib fractures occurred "as the chest was being compressed in a severe fashion." "[B]ased purely upon evaluation of the x-rays," Dr. Kleinman testified that the child's rib and leg fractures were indicative of battered child syndrome.

The Commonwealth's medical evidence was disputed by two forensic pathologists presented by the defense: Dr. William Sturner, chief medical examiner for the State of Rhode Island and a professor of pathology at Brown University, and Dr. Michael Baden, director of forensic sciences for the New York State police, who had served as a medical examiner for many years in the New York City medical examiner's office. Dr. Sturner testified that, in his opinion, the child's skull fracture was caused by a moderate amount of trauma, not the severe trauma suggested by the Commonwealth's medical examiner. Severe trauma, he explained, would have resulted in injuries (other than swelling) to the child's brain, which did not occur in this case. Contrary to the Commonwealth's evidence, he testi-

fied, the child's head injuries were not consistent, indeed were inconsistent, with what a child would suffer if she fell from the second story of a building. He further testified that the swelling of the child's brain was mild, not moderate, and could have been caused not only by blunt force trauma, but also by "resuscitation" or "agonal changes." Significantly, Dr. Sturner testified that the child's head injuries were consistent with the defendant's account of what had happened, namely, that she was propelled from the defendant's arms and struck the kitchen counter top as he ran to the telephone.[2]

The defendant's second medical expert, Dr. Baden, testified that there was no injury to the brain, and "no evidence of, or slight evidence only, of swelling of the brain." He described how slight swelling of a brain can be caused by "resuscitation procedures" or even "the act of dying" itself. Contrary to the conclusion of the Commonwealth's medical examiner, he distinguished the child's head injuries from the types of injuries a child would suffer if she fell from a window. Significantly, he also testified that the injuries were not consistent with the injuries in other cases he had experienced in which a child had been swung by the ankles against a blunt surface, because in this case, unlike those cases, there was no evidence of bruising, tearing, or hemorrhaging of the brain. Dr. Baden also explained that, in his opinion, the evidence in this case did not satisfy all the criteria necessary to support a conclusion of battered child syndrome or shaken baby syndrome. Like Dr. Sturner, Dr. Baden testified that the head injuries could have occurred in the manner described by the defendant.[3]

For present purposes, this medical testimony is the most

---

[2]Dr. Sturner further testified that only a moderate degree of force was needed to fracture the ribs of an infant, specifically force of a type that "could be reasonably characterized as affectionate squeezing." He testified that the fractures of the leg bones may have been caused by the child's having been shaken by the defendant, as the defendant admitted he did in an attempt to revive her. Dr. Sturner also testified that "this case does not fulfill all [the] criteria" of shaken baby syndrome, and that the bruises under the child's chin were consistent with her having been grabbed and shaken in the manner the defendant described.

[3]Dr. Baden further explained that, in his opinion, the child's rib fractures could have been caused by an overly aggressive hug by a parent, or by another child falling on top of her; that certain of the leg fractures testified to

important evidence in the case. However, there was also substantial nonmedical evidence presented by both sides. The Commonwealth presented evidence that the child had suffered other injuries in the weeks before her death, while in the defendant's care. The Commonwealth also introduced evidence of acts done and statements made by the defendant, both before and after the child's death, which, when viewed in a light favorable to the Commonwealth, indicated that he bore ill will toward the child, as well as testimony regarding statements made by the defendant after the child's death that, the Commonwealth claims, were indicative of guilt and inconsistent with his version of having accidentally dropped the child.

The defendant, on the other hand, presented evidence suggesting that the child's injuries in the weeks before her death were caused innocently and accidentally, and, in any case, not necessarily by him. He introduced evidence that, when viewed favorably to him, suggested that certain acts and statements attributed to him by the Commonwealth's witnesses had been taken out of context or misconstrued. He denied having made some of the statements attributed to him. With respect to his claim that he accidentally dropped the child on the kitchen counter, he presented evidence that he had made consistent statements to the police, to his employee, and to his attorney shortly after the incident. He also offered testimony from witnesses who had found him to be a loving and caring father who never injured any of his children.

*Discussion.* It is indisputable that malice is an essential aspect of the crime of murder. See *Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995). "Malice is what distinguishes murder from manslaughter." *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 396 (1998), *S.C.*, 431 Mass. 360 (2000). It is also indisputable that the judge's instructions on malice in this case were incorrect. Although the judge correctly instructed the jury regarding the first and second definitions of malice — that malice is established by proof beyond a reasonable doubt that

by the Commonwealth's experts had in fact occurred post mortem, when the bones were removed and tissue slides were prepared as part of the autopsy; and that the bruises on the child's chest had been caused by the various attempts to resuscitate her.

the defendant specifically intended either to kill the alleged victim or to cause grievous bodily harm — he erroneously defined the so-called third prong of malice, sometimes referred to as inferred malice. This third definition of malice permits a jury to infer malice "if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." *Commonwealth v. Grey*, 399 Mass. 469, 470 n.1 (1987). The concept of inferred malice is well established. See *Commonwealth v. Chance*, 174 Mass. 245, 252 (1899).

Here, the judge repeatedly defined the third prong of malice incorrectly. Addressing the jury pool before the empanelment process began, he stated that murder is "the unlawful killing of a human being . . . *by an act which, although it was not intended to kill or to cause grievous bodily harm, was an act which, in the ordinary experience of people, was likely to lead to serious bodily injury or death.*" As part of a preliminary charge, given after the jury were selected but before any evidence was introduced, the judge told the jury that "[t]he government must prove beyond a reasonable doubt one of three things to prove malice. . . . [T]he government must prove an unexcused intent, either to kill, or an unexcused intent to do grievous, that is, serious bodily harm, *or an unexcused intent to do an act which creates a strong and plain likelihood that death, or serious harm, will follow . . . .*" In his final charge to the jury before their deliberations, the judge also instructed them three more times that the third definition of malice included the doing of an act that created a plain and strong likelihood of grievous bodily harm. He stated:

> "Now, malice in the law is somewhat different from the concept that comes to your mind when you think of the word malice in its ordinary English usage. To prove malice, the Government must prove beyond a reasonable doubt one of three things: either, that [the defendant] acted intending to kill [the child]; or, that he acted intending to cause her grievous, that is serious, bodily harm; *or, that he intended to do an act creating a strong and plain likeli-*

*hood, in light of normal human experience, that death or grievous, that is, serious, bodily harm would result to [the child].*

"So, malice in the sense that we are talking, means an act either with an intent to kill, or with an intent to cause serious grievous bodily harm, *or an act, an intentional act creating a strong and plain likelihood, in light of normal human experience, that death or grievous, that is serious, bodily harm would result.*

"I think the concept of acting with intent to kill is reasonably clear. I think the concept of acting with intent to cause grievous, that is, serious, bodily harm, is reasonably clear. The thing to understand about the third possible way of proving malice is that the law does not concern itself with what the person thought would be the consequences of his act. The law imposes, if you will, an external standard. It says that in considering the defendant's conduct, the jury measures the conduct by what a reasonable person should expect would follow in light of human experience. So that the third route, if you will, to establish malice, requires the jury to consider the act that the Government seeks to prove was intentionally accomplished. If you are not satisfied beyond a reasonable doubt, if you are considering this aspect of the case, that the defendant intended to do an act, then you need inquire no longer. If you are persuaded beyond a reasonable doubt that he intended to do an act, then you consider what a reasonable, ordinary person should in the light of ordinary normal human experience have realized would be the consequences of that act. *And if the Government has persuaded you that the normal ordinary consequence to a reasonable person, the foreseeable ordinary consequence of that act to a reasonable person, would have been the infliction of death, or grievous serious bodily harm, then the Government will have proved that particular aspect of the case.*"

At no point did the judge give the correct definition of third prong malice, which permits an inference of malice only in

situations where a reasonable person would recognize a plain and strong likelihood of death.[4]

The errors in the instructions were exacerbated in this case by the prosecutor's invitation to the jury to base their decision on the third prong of malice, and also by her reference to an erroneous definition of the third prong. Early in her argument, the prosecutor stated:

> "[The child] did not die of an accident. And [the child] did not die of any reckless conduct. *[The child] died because this defendant did an act, caused that blow to her head. And that that act, ladies and gentlemen, created a plain and strong likelihood that serious grievous bodily injury or death would occur.* And it did.

> "And ladies and gentlemen, you can forget about the defense attorney telling you you have to find he intended to kill or murder; you don't. *You just have to find that he did the act, that he struck the blow, that he caused the injury to the head. And that's murder.*"

We recently explained at length how the inclusion of grievous bodily harm language in the definition of the third prong of malice blurs the distinction between murder and involuntary manslaughter. See *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 394-397 (1998), *S.C.*, 431 Mass. 360 (2000). We need not repeat that explanation in detail here. It suffices to say that the judge's instructions were deficient in this regard,[5] and we shall now address the question whether these erroneous instructions require us to grant relief in the circumstances of this case.

---

[4]Nor did the judge instruct the jury on the subjective component of third prong malice. See *Commonwealth* v. *Mello*, 420 Mass. 375, 389-390 (1995); *Commonwealth* v. *Grey*, 399 Mass. 469, 472 n.4 (1987).

[5]We recognize the possibility that the judge was misled by some opinions of this court that incorrectly included grievous bodily harm language in the description of the third prong of malice. See, e.g., *Commonwealth* v. *Huot*, 380 Mass. 403, 408 (1980). Despite the appearance of the offending language in those cases, "[w]e reject any suggestion that we have made something less than a plain and strong likelihood of death sufficient for proof of the third prong of malice." *Commonwealth* v. *Sires*, 413 Mass. 292, 303 n.14 (1992). See *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392, 396 n.5 (1998), *S.C.*, 431 Mass. 360 (2000); *Commonwealth* v. *DiRenzo*, 44 Mass. App. Ct. 95, 99-100 (1997). In other words, notwithstanding any confusion that existed when this case was tried, the instructions were erroneous when given. To foreclose any

The defendant did not object at trial to the erroneous malice instructions, nor did he raise this issue in his direct appeal.[6] Instead, he raised the claim for the first time in his 1998 pro se motion for a new trial, which was the first postappeal new trial motion that he filed. In these circumstances we review the claim to determine whether the erroneous instructions created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Chase*, 433 Mass. 293, 299 (2001). The fact that the judge, in ruling on the new trial motion, declined to address the substantive merits of the defendant's claim does not alter the standard of review. On appeal from a denial of a postappeal motion for a new trial, the standard is the same regardless of whether the judge addresses the merits. *Commonwealth* v. *Curtis*, 417 Mass. 619, 624 n.4 (1994). See Reporters' Notes to Mass. R. Crim. P. 30 (c) (2), as appearing in *post* 1501 (2001) ("The standard of review from the denial of a new trial motion filed after an appeal has been decided is the same whether the motion judge considered the issue or not, whether there was a substantial risk of a miscarriage of justice").[7] Contrast *Commonwealth* v. *Hallet*, 427 Mass. 552, 552-555 (1998) (discussing standard of

---

remaining confusion, we repeat that *Huot* and other cases that used the same language did not state a correct definition of third prong malice.

We disagree with the defendant's claim that clairvoyance would have been needed to recognize the correct definition of the third prong of malice at the time this case was tried. The third prong of malice, correctly defined, has been part of Massachusetts jurisprudence since the Nineteenth Century. See *Commonwealth* v. *Chance*, 174 Mass. 245, 252 (1899). Although incorrectly described in some cases, it was also correctly cited in other cases decided before this case was tried. In particular, *Commonwealth* v. *Grey*, *supra* at 470 n.1 and 472 n.4, clearly and correctly defined the third prong of malice. *Grey* was decided more than two years before this case was tried. In these circumstances, clairvoyance was not necessary to raise and preserve the issue. See *Commonwealth* v. *Chase*, 433 Mass. 293, 297-298 (2001), and cases cited.

[6]The Commonwealth argues that the Appeals Court decided "[t]hese exact issues" in the defendant's direct appeal. That is incorrect. There was no issue raised or decided in the first appeal concerning the instructions on malice. The Appeals Court's holding that the evidence at trial was sufficient to warrant a finding of malice, *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 304-306 (1992), is different from the critical question that is before us now, which, as we shall explain, is whether the evidence required a finding of malice, as malice is properly defined.

[7]To the extent that *Commonwealth* v. *Martinez*, 420 Mass. 622, 624-625 & n.3 (1995), suggests that a different standard of review applies if the judge

review applicable when deciding an appeal from denial of motion for new trial filed and acted on prior to defendant's direct appeal).

The fact that the defendant was represented by the same counsel at trial and on direct appeal underscores the appropriateness of our choice of the standard of review in this case. The defendant claimed for the first time in his postappeal motion for a new trial that the attorney who represented him at trial and on his direct appeal was ineffective in failing to object to the error in the malice instructions. In cases like this, where the same attorney represents a defendant at both the trial and on appeal, a claim of ineffective assistance of counsel is not waived when it is raised for the first time in a postappeal new trial motion. *Commonwealth* v. *Egardo*, 426 Mass. 48, 49-50 (1997). *Commonwealth* v. *Lanoue*, 409 Mass. 1, 3-4 (1990).[8] Moreover, when the claim of ineffectiveness is predicated, as it is here, on counsel's failure to object to something that occurred at trial, the standard for evaluating the ineffectiveness claim is not significantly different from the substantial risk standard that is applicable to our review of the underlying, unpreserved error. See *Commonwealth* v. *Peters*, 429 Mass. 22, 31 n.12 (1999); *Commonwealth* v. *Bart B.*, 424 Mass. 911, 914 (1997); *Commonwealth* v. *Amirault*, 424 Mass. 618, 652 n.24 (1997); *Commonwealth* v. *Curtis*, 417 Mass. 619, 624-625 n.4 (1994). Hence, whether we view the unpreserved claim of error in the malice instructions directly, utilizing the substantial risk of a miscarriage of justice standard, or indirectly, by focusing on counsel's ineffectiveness in failing to object to the error, our approach is

declines to address the merits of the claims raised by a defendant in a postappeal new trial motion, we adhere to the formulation described in *Commonwealth* v. *Curtis*, 417 Mass. 619, 624-625 n.4 (1994).

[8]The Commonwealth claims that the principle of *Commonwealth* v. *Egardo*, 426 Mass. 48, 49-50 (1997), and *Commonwealth* v. *Lanoue*, 409 Mass. 1, 3-4 (1990), should not apply because, while the present appeal was pending in the Appeals Court, the defendant filed a motion in the Superior Court seeking release on bail pending appeal, see Mass. R. Crim. P. 30 (c) (8) (A), as appearing in 420 Mass. 1502 (1995), and indicated that his trial counsel would be representing him on the motion. We disagree. The issue is not whether the defendant continues to have confidence in his first counsel. The issue is whether that counsel provided effective assistance in the constitutional sense.

essentially the same, and, as will be seen, the result would be the same.

The substantial risk standard requires us to determine "if we have a serious doubt whether the result of the trial might have been different had the error not been made." *Commonwealth* v. *LeFave*, 430 Mass. 169, 174 (1999). We review the evidence and the case as a whole. We consider the strength of the Commonwealth's case, the nature of the error, the significance of the error in the context of the trial, and the possibility that the absence of an objection was the result of a reasonable tactical decision. See *Commonwealth* v. *Chase, supra* at 299; *Commonwealth* v. *Alphas*, 430 Mass. 8, 13 (1999); *Commonwealth* v. *Amirault, supra* at 645-647; *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986).[9] "A new trial will be ordered only in the extraordinary situation where, after such a review, we are left with uncertainty that the defendant's guilt has been fairly adjudicated." *Commonwealth* v. *Chase, supra*. We have said that this standard is particularly well suited to a situation, such as here, where the elements of a crime are erroneously stated in the jury charge. *Commonwealth* v. *Amirault, supra* at 647 n.21, and cases cited ("It is striking that this power is frequently used in respect to jury charges that include erroneous instructions as to the elements of a crime").

The instructions in this case created a risk that the jury would find the presence of malice, and therefore a risk that they would find murder, on mere proof of a plain and strong likelihood of grievous bodily harm. The same error has required reversals and new trials in some cases. See *Commonwealth* v. *Williams*, 428 Mass. 383 (1998); *Commonwealth* v. *Vizcarrondo, supra*; *Commonwealth* v. *Pichardo*, 45 Mass. App. Ct. 296 (1998); *Commonwealth* v. *DiRenzo*, 44 Mass. App. Ct. 95 (1997). In other cases, it has not been necessary to order new trials because the evidence in the cases did not warrant a finding of a risk of harm less than a plain and strong likelihood of death. Such

---

[9]Contrary to the Commonwealth's contention, the trial judge would be in no better position than we are, at this point, to make the determination whether there has been a substantial risk of a miscarriage of justice. That determination requires no fact-finding, and, indeed, it is a determination that appellate courts make frequently. We therefore need not remand the case to the trial judge, as the Commonwealth requests.

cases typically have involved the use of an inherently danger-
ous weapon, such as a gun, knife, or explosive device, or clear
evidence of a prolonged and calculated assault. See, e.g., *Com-
monwealth* v. *Freeman*, 430 Mass. 111, 123 (1999); *Com-
monwealth* v. *Murphy*, 426 Mass. 395, 401 (1998); *Com-
monwealth* v. *Fryar*, 425 Mass. 237, 248, cert. denied, 522 U.S.
1033 (1997); *Commonwealth* v. *Mello*, 420 Mass. 375, 390
(1995); *Commonwealth* v. *Niland*, 45 Mass. App. Ct. 526, 532
(1998); *Commonwealth* v. *Caines*, 41 Mass. App. Ct. 812, 816-
817 (1996). To put it differently, a new trial is unnecessary
where the presence of malice, as it is correctly understood, can
be "ineluctably inferred" from the evidence. *Commonwealth* v.
*Vizcarrondo*, *supra* at 397. The question is whether the evidence
required the jurors to find a plain and strong likelihood that
death would follow from the defendant's acts; only then can we
say that the erroneous instructions were nonprejudicial. *Id.* at
397-398.

The conflicting evidence in this case prevents us from
concluding that the jury were required to find a plain and strong
likelihood of death. The Commonwealth's evidence, on the one
hand, supported a conclusion that the defendant had intention-
ally inflicted injuries on the child in the days and weeks before
the child died; that the child was a victim of battered child
syndrome and shaken baby syndrome; and that the head injuries
she suffered on the day she died, which resulted in her death,
were the result of severe blunt force trauma. The doctor who
performed the autopsy opined that the child had been held by
the ankles and swung headfirst, with great force, into a broad,
flat surface.

While the Commonwealth's evidence may have been strong,
it was not incontrovertible, and, indeed, it was controverted.
Defense witnesses, including the defendant and his two forensic
experts, testified to possible alternative causes of the child's
various injuries. The absence of injury to the child's brain, ac-
cording to the defense experts, indicated that her injuries were
not caused by the type of severe blunt force trauma suggested
by the medical examiner; the defense's medical evidence
demonstrated that a moderate trauma was indicated, and that the

child's head injuries were consistent with the defendant's account of the events. Both defense experts contested that the Commonwealth's evidence necessarily demonstrated that the child was a victim of battered child syndrome or shaken baby syndrome.

With the case in this posture, our role is not to sit as a second jury. See *Commonwealth* v. *Alphas, supra* at 20-23 (Greaney, J., concurring). It is not for us to say that one side's evidence was more credible than the other. As an appellate court, our focus is on whether the evidence required the jury to find that a plain and strong likelihood of death would follow the defendant's actions. The jury might well have rejected, and apparently did reject, the defendant's explanation that the child's head injuries occurred accidentally. Yet in view of the disputed medical evidence, the jury were not required to find that the injuries were caused by the type of severe force, and in the egregious manner, alleged by the Commonwealth.[10] They could have found on this evidence that the defendant's acts, although intentional (in the sense of being nonaccidental), created at most a plain and strong likelihood of grievous bodily harm, and not necessarily a plain and strong likelihood of death. Thus malice, as it is properly defined, cannot be ineluctably inferred.[11]

The convergence of these facts — that the defining element of the crime was misstated; that the evidence did not require a finding of malice under the correct definition; that the prosecutor's argument expressly invited the jury to proceed under the erroneous definition; and that there is no reasonable tactical basis for a failure to object to a mistaken and unfavorable (to the defendant) definition of an element of the crime —

---

[10]The jury's rejection of a finding of extreme atrocity or cruelty gives us some indication that they did not fully accept the Commonwealth's version of events.

[11]The jury's apparent rejection of the defendant's accident defense merely indicates that the jury believed that the injuries to the child were caused by an intentional act. It does not necessarily indicate that the jury found that the defendant subjectively intended to cause grievous bodily harm (second prong of malice). The conflicting evidence as to the severity of the injuries and their possible causes prevents us from concluding that a finding of specific intent to cause grievous bodily harm was required.

leads us to conclude that there has been a substantial risk of a miscarriage of justice.[12]

Although the defendant filed his motion for a new trial more than six years after the Appeals Court affirmed his conviction on direct appeal, and more than nine years after his trial, the governing rule, Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979), authorizes the filing of new trial motions "at any time if it appears that justice may not have been done." We have previously stated that "a defendant's delay in bringing a rule 30 motion does not in itself constitute waiver." *Commonwealth* v. *Francis*, 411 Mass. 579, 586 (1992). Contrast Mass. R. Crim. P. 30 (c) (2), 378 Mass. 900 (1979), concerning the failure to raise an available issue in the "original" postconviction motion for a new trial. The Commonwealth has not demonstrated that the defendant's "delay" was designed to obtain any strategic advantage. See *Commonwealth* v. *Francis, supra* at 585-586.

*Conclusion.* The judge's order declining to act on the defendant's motion for a new trial is vacated, and the case is to be remanded to the Superior Court for a new trial.

*So ordered.*

---

[12]We note parenthetically that, from our review of the record, it appears that the evidence was more than sufficient to warrant a finding of involuntary manslaughter.