Commonwealth v. Lapointe.

COMMONWEALTH vs. LEO LAPOINTE, JR.

No. 99-P-1088.

Bristol. October 10, 2001. - September 12, 2002.

Present: ARMSTRONG, C.J., GILLERMAN, PERRETTA, PORADA, & DUFFLY, JJ.

*Practice, Criminal,* Instructions to jury, Assistance of counsel. *Homicide. Intoxication. Mental Impairment. Constitutional Law,* Assistance of counsel, Waiver of constitutional rights. *Waiver.*

On the defendant's first motion for a new trial in a murder case on the basis that alleged errors in the judge's instructions to the jury created the possibility that the jury had convicted the defendant of murder on the basis of conduct that could have supported a verdict only of manslaughter, and that the defendant's trial and appellate counsel were ineffective in failing to challenge the alleged defects in the judge's instructions, the motion was properly denied, where the judge's instructions adequately covered the alleged omissions that were the basis of the motion, and, consequently, the defendant's claims, including those of ineffective assistance of counsel, failed. [802]

On appeal from the defendant's second motion for a new trial in a murder case on the basis that the judge's instructions to the jury with regard to third prong malice were error because of a reference to "grievous bodily harm," and that trial and appellate counsel were ineffective in failing to challenge the instructions as erroneous, this court concluded that the defendant's claims were waived because they could have been raised on direct appeal or on his first motion for a new trial; however, even if it were to assume that the claims were not waived, this court further concluded that the judge did not abuse his discretion in denying the motion because he was correct in ruling that the error did not create a substantial risk of a miscarriage of justice, where, despite the defendant's contention that his intoxication or mental condition was such that he lacked the ability to form the specific intent necessary for the crime of murder, the court was confident that the defendant's guilt was assessed fairly, and that the result would not have been otherwise but for the error in the charge. [802-806] DUFFLY, J., dissenting, with whom GILLERMAN, J., joined.

INDICTMENT found and returned in the Superior Court Department on August 16, 1990.

Following review by this court, 36 Mass. App. Ct. 909 (1994),

motions for a new trial, filed on January 9, 1996, and July 1, 1999, respectively, were considered by *John M. Xifaras*, J., and heard by *John A. Tierney*, J.

*Susan Murphy* for the defendant.

*Robert L. Goodale*, Assistant District Attorney, for the Commonwealth.

PORADA, J. After his conviction for second degree murder was affirmed, *Commonwealth* v. *Lapointe*, 36 Mass. App. Ct. 909 (1994), the defendant filed two motions for a new trial. The principal thrust of both motions was that alleged errors in the judge's instructions created the possibility that the jury had convicted the defendant of murder on the basis of conduct that could have supported a verdict only of manslaughter, and that the defendant's trial and appellate counsel were ineffective in failing to challenge the alleged defects in the judge's instructions. The motions were denied, and the defendant now appeals. We affirm.

We first summarize the evidence presented at trial. On August 1, 1990, the defendant, accompanied by a female friend, went to the Magic Mushroom bar in Fall River where he had at least five or six drinks. He urinated while standing at the bar and after he did so, a patron at the bar, John Brady, yelled at him and slapped his penis. A fight then ensued between the defendant and the Brady brothers, John and Ralph. During the fight, the defendant received a number of cuts and a bite on the cheek. The bartender broke up the fight and ejected the defendant from the bar.

The defendant then got into a car driven by a female friend. As they drove away, the defendant told his female friend that "he wanted his bros" and "they were not going to get away with it." The defendant then told his friend to stop the car and to get out. When she did not, he gave her a gentle shove. She then got out of the car and the defendant got into the driver's seat and drove the car back to the bar. He double parked the car, and entered the bar.

When the defendant entered the bar, the bartender saw that he had a combat knife in his hand. The knife measured thirteen inches, of which five and one-half inches was the blade. The defendant walked over to Ralph Brady and plunged the knife

into his chest. The defendant then turned around and started to run out of the bar. As he did, both Brady brothers threw chairs at him, hitting him on the head. The defendant then got back into the driver's seat of his friend's car. He started the car, but it stalled; he started it again. The defendant and his friend then drove off.

Because the defendant's face was bleeding profusely, his friend persuaded him to let her drive. She drove to a pay phone where the defendant gave her a telephone number to dial. The defendant then spoke on the phone for a couple of minutes. After the phone call, the defendant directed his friend to drive to an apartment house. There, the defendant led his friend to an apartment where a man unsuccessfully attempted to treat the defendant's injuries. Shortly afterward, his female friend brought the defendant to St. Anne's hospital. While at the hospital, the defendant asked his friend why he was there. A nurse in the emergency room testified that while the defendant had appeared to be intoxicated and was yelling, he had known where he was and that he was being treated. A security guard in the emergency room testified that he had engaged in a normal conversation with the defendant, who had told him that he had had a fight with three men in a bar, one he claimed he had "decked," another he had thrown against a wall, and the third he had grabbed his arm to take a knife away, but could not remember anything thereafter.

The defendant testified that he remembered going to the bar that evening but had no memory about what had happened there. He presented expert testimony that he was of borderline intelligence, was in an alcohol-induced hallucinatory state at the time of the stabbing, and suffered from "organic brain syndrome." His expert testified that the combination of his organic brain syndrome and the alcohol would have produced a lethal combination that would not have allowed the defendant to appreciate the wrongfulness of his conduct or to control his behavior. In rebuttal, the Commonwealth presented expert testimony that while it was possible that the defendant was suffering from a mental disease or defect at the time of the incident, his purposeful conduct prior to and after the incident demonstrated that he was not thereby disabled from conforming his conduct to the requirements of the law.

The autopsy report, admitted as an exhibit, disclosed that the knife that was used by the defendant penetrated the victim's chest to a maximum depth of about six inches, and cut into the victim's right lung and main aorta resulting in a rapid death.

We now turn to our analysis of the issues raised in the defendant's two motions.

1. *First motion for a new trial.* The first motion, which the defendant filed pro se, alleged that the judge committed an error in failing to instruct the jury that they could return a verdict of manslaughter if they found that the defendant's intoxication or mental condition was such that he lacked the ability to form the specific intent necessary for the crime of murder, and that his trial and appellate attorneys were ineffective in failing to raise this claim of error during the trial and in his direct appeal. The motion judge, who was not the trial judge, denied the motion summarily without a hearing or statement of reasons for his denial.

The denial was proper.[1] The truncated instruction that is the basis of the defendant's claim is not a correct statement of the law because it failed to take into consideration the required elements for either murder under a third prong malice theory or manslaughter. However, the trial judge properly instructed the jury that they must consider the defendant's intoxication and mental impairment in determining whether the defendant had the ability to form the specific intent to kill *or* to do grievous bodily harm, and twice told the jury that the difference between murder and manslaughter is that manslaughter requires no finding of malice, which the judge had defined as including an unexcused specific intent to kill or to do grievous bodily harm. Thus, the judge's instructions adequately covered the alleged omissions that were the basis for the first new trial motion. It follows that all of the defendant's claims, including those of ineffective assistance of counsel, fail. As to this point, all the panelists are in accord.

2. *Second motion for a new trial.* The defendant, through appointed counsel, filed a second motion for a new trial in which he claimed that the following instruction was erroneous:

---

[1]Because of the claim of ineffectiveness of appellate counsel, who was not trial counsel, we pass on determining whether this issue was waived.

"Malice aforethought may be inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death or grievous bodily harm would follow the contemplated act."[2]

The defendant also claims that his trial and appellate counsel were ineffective in failing to challenge the instruction as erroneous at the trial and appellate levels. The motion judge, who was not the same judge who heard the first motion, held a hearing and determined that the instruction was indeed erroneous because of the inclusion therein of the words "grievous bodily harm," but that there was no substantial risk of a miscarriage of justice because the evidence did not warrant a finding of a risk of harm less than a strong likelihood of death because of the means used to kill the victim. *Commonwealth* v. *Fryar*, 425 Mass. 237, 248, cert. denied, 522 U.S. 1033 (1997). *Commonwealth* v. *Murphy*, 426 Mass. 395, 401 (1998). Accordingly, the judge ruled that this determination was also dispositive of the defendant's claims of ineffectiveness of trial and appellate counsel. Because the judge determined there was no substantial risk of a miscarriage of justice from the claimed error, the judge ruled that he need not determine whether the claims had been waived.

Based upon our review of the record, we conclude that the defendant's claims were waived. At the time of the defendant's direct appeal, the inclusion in an instruction on third prong malice of the words "grievous bodily injury" or "grievous bodily harm" had been disapproved by the Supreme Judicial Court. *Commonwealth* v. *Sires*, 413 Mass. 292, 303-304 n.14 (1992). His appellate counsel could have raised this claim in his direct appeal, as well as a claim of ineffective assistance of trial counsel in failing to object to the instruction. Similarly, the defendant's claim of ineffective assistance of appellate counsel based on this omission could have been raised in the defendant's first motion for a new trial. Although the first motion for a new

---

[2]Although the defendant refers in his statement of facts to other instructions that the trial judge gave in defining third prong malice, which differ in content from the one quoted, his claim of error on appeal is predicated solely on the specific instruction quoted above.

trial was filed by the defendant pro se, it contained a claim of ineffective assistance of appellate counsel in failing to raise as a claim of error the judge's alleged omission of an instruction distinguishing manslaughter from murder and trial counsel's failure to request it. The content of the defendant's first motion indicates the defendant's study of the judge's instructions on murder, and an awareness that a misstep by his appellate counsel in failing to claim an error regarding these instructions could constitute ineffective assistance of appellate counsel. As such, it does not excuse the defendant's failure to allege a claim of ineffective assistance of appellate counsel based on the erroneous instruction on the third prong of malice. Because the claims were waived, the motion was properly denied. *Commonwealth v. Watkins*, 433 Mass. 539, 547-548 (2001). See *Commonwealth v. LeFave*, 430 Mass. 169, 171-174 (1999).

However, even if we were to assume that the claims were not waived, the judge did not abuse his discretion in denying the motion because he was correct in ruling that the error did not create a substantial risk of a miscarriage of justice. Relief from waiver is permissible where the evidence and the case as a whole leave one with a serious doubt whether the result of the trial might have been different had the error not been made. *Commonwealth v. LeFave*, 430 Mass. at 174. *Commonwealth v. Azar*, 435 Mass. 675, 687 (2002). A mere possibility of a different outcome will not satisfy the test. *Commonwealth v. Amirault*, 424 Mass. 618, 652 (1997). Here, the jury rejected the claim that the defendant was insane at the time of the incident. Having done so, the Commonwealth's case was strong based on the first and second prong of malice in light of evidence that the defendant stated that "they were not going to get away with it," that thereafter the defendant, with a combat knife in hand, purposefully returned to the scene of the fight, and without any further contact or words plunged a combat knife with a five and one-half inch blade into the chest of his prior combatant, and then fled. Nevertheless, because we do not know on what prong of malice the jury based their verdict, we shall assume favorably to the defendant that the guilty verdict was based on the third prong of malice, and consider whether the verdict would have been different if there had been no error in the judge's

instructions on third prong malice. *Commonwealth* v. *Delaney*, 418 Mass. 658, 666-667 (1994).

We think not. The error in the specific instruction on which the defendant's claim is based relates solely to the objective component of third prong malice, whether a reasonable person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act. Stabbing a person in the chest with a five and one-half inch blade would not have warranted a finding by the jury of an objective risk of harm less than a strong likelihood of death. *Commonwealth* v. *Fryar*, 425 Mass. at 248. *Commonwealth* v. *Murphy*, 426 Mass. at 401. *Commonwealth* v. *Stroyny*, 435 Mass. 635, 649-650 (2002). The defendant argues, however, that that conclusion is not mandated in this case where there was evidence that the defendant was mentally impaired and intoxicated. In those circumstances, the defendant contends that the jury reasonably may have found that he was unaware that he was stabbing the victim. In specific support of such a possibility, the dissent points to evidence of the defendant's conversation, discussed above, with the emergency room security guard. To the guard, the defendant stated that he had been involved in a barroom fight, that he had "decked" someone, and that he had thrown someone against a wall. The dissent contends that these remarks, taken together with the general evidence of the defendant's mental deficit and heavy drinking, might have led the jury to find that the defendant had no subjective awareness of stabbing. The dissent then goes on to suggest that, misled by the judge's erroneous charge, the jury might have convicted the defendant of murder on a third prong theory based on conduct which did not pose the required objective risk of death — i.e., "decking" and throwing someone against a wall. *Post* at 808-809. We reject such a possibility.

In this case, there was overwhelming evidence of rationality, planning, and self-composure on the part of the defendant as he carried out his deadly assault on the victim. Upon leaving the bar, he told his friend that he would avenge himself on the Brady brothers. He was able to drive a car and return the bar. He armed himself, located a specific victim among the bar's patrons, and struck a single fatal blow with apparent dexterity.

He then immediately retreated, and sought medical attention for his own injuries.

In light thereof, no reasonable view of the evidence could have supported an inference that the defendant was unaware that he was stabbing the victim.[3] While it is true that in assessing the effects of the particular type of error alleged here, it is necessary to view the evidence in the light most favorable to the defendant, this by no means requires us to conclude that a substantial risk of miscarriage of justice occurs because there is a mere possibility of a different outcome. *Commonwealth* v. *Amirault*, 424 Mass. at 652. There is a substantial risk of miscarriage of justice only if the evidence of the case as a whole leaves us with a serious doubt that the defendant's guilt has been fairly adjudicated. *Id.* at 646-647. Here, based on the evidence and the case as a whole, we are confident that the defendant's guilt was assessed fairly, and that the result would not have been otherwise but for the error in the charge. Knowingly stabbing a victim with the type of weapon used here necessarily creates a strong and plain likelihood that death will result.

> *Orders denying first and second motions for a new trial are affirmed.*

DUFFLY, J. (dissenting, with whom Gillerman, J., joins). The majority acknowledges that the instruction with regard to third prong malice was error because of the reference to grievous bodily harm, but concludes that there was no substantial risk of

---

[3]As an aside, we note that the evidence on which the dissent so heavily relies, the conversation with the security guard, does not actually relate to the crucial issue here — the defendant's subjective awareness at the time of the attack. For the purposes of assessing whether the defendant acted with malice, his subsequent memory of the events surrounding the stabbing is totally irrelevant; rather, the dispositive point is the defendant's knowledge at the time of the attack. While the evidence we have focused on relates to the latter, the testimony concerning the conversation with the guard relates primarily to the former. Needless to say, there are also obvious reasons why the defendant might have been inclined to provide an exculpatory version of the events to the hospital security guard.

a miscarriage of justice, citing the strength of the Commonwealth's case and evidence that the defendant purposefully returned to the scene with a combat knife and stabbed the victim with it. I respectfully dissent because the majority's focus on the evidence of the defendant's conduct attaches no importance to the evidence of his substantial impairment, that is to say his subjective understanding of what he was doing.

Where the evidence is conflicting, as it was in this case on the issue of what the defendant knew, an appellate court is prevented "from concluding that the jury were required to find a plain and strong likelihood of death." *Commonwealth* v. *Azar*, 435 Mass. 675, 688 (2002). "It is not for us to say that one side's evidence was more credible than the other." *Id.* at 689. By placing undue emphasis on the testimony of the Commonwealth's expert and evidence of the defendant's conduct, the majority assumes the jury concluded that the defendant was aware he held a knife and stabbed someone with it. Although the facts would warrant such a finding, the jury could as readily have found that the impaired defendant was unaware of having held a knife or stabbed a person. "Any thought that we should disregard the error in the instructions because the evidence plainly warranted a finding of malice on [a] largely objective basis . . . has to be rejected." *Commonwealth* v. *Grey*, 399 Mass. 469, 474 n.4 (1987).[1]

The issue is not whether the judge gave a correct instruction on impairment.[2] Rather, the basis of my dissent is that the evidence, including the evidence of impairment, did not require the jurors to find that the defendant knew he had a knife and knew that he stabbed the victim with it. *Commonwealth* v. *Azar*, 435 Mass. 675, 688 (2002). In order to determine whether there has been a substantial risk of a miscarriage of justice, "[w]e

---

[1] "The evidence here warranted a finding of guilty of murder in the second degree. Nothing we decide today eliminates the possibility that, at a second trial, such a verdict will again be returned." *Commonwealth* v. *Grey*, 399 Mass at 474.

[2] Nor do I think it appropriate to consider whether the Commonwealth's evidence is sufficient to support a conviction on the basis of the first or second prongs of malice. The jury did not specify their theory of malice, and in these circumstances we "assume, favorably to the defendant, that the guilty verdict was based on the [consideration of an incorrect instruction as to the] third prong of malice." *Commonwealth* v. *Delaney*, 418 Mass. 658, 666-667 (1994).

review all of the evidence and the case as a whole," *Commonwealth* v. *Azar*, 435 Mass. at 687. Where, as here, there is strong evidence of impairment affecting the defendant's state of knowledge of the entire event, the analysis requires that we consider that evidence in determining what the jury could have concluded about the defendant's state of knowledge. See *Commonwealth* v. *Sama*, 411 Mass. 293, 296 (1991).[3]

On all of the evidence, the jury could have found the following: As the result of a serious childhood automobile accident and a subsequent accident resulting in head trauma, the defendant suffered from organic brain syndrome. He functioned at a borderline level of intelligence. During the relevant timeframe, he had "an intoxicated blood level of alcohol" and was in a "severe state of intoxication." The effect of alcohol on the defendant's brain function would put the defendant at the time of the stabbing "in the midst of an alcoholic hallucinatory psychotic state." In this state he had no recollection of having had a knife or of stabbing anyone. He could recall none of the events that occurred from the time he urinated at the bar until after the stabbing when he arrived at the hospital, wondering aloud why he was there. After being informed by his friend that he had been in a fight and that two or three guys had jumped him, he stated to a hospital security guard that he had been in a fight with three people, that he had been hit with a full bottle, "a third guy came at him with a knife," and he had "decked"

---

[3]*Commonwealth* v. *Sama, supra,* illustrates that the use of a knife in circumstances which, objectively, support the conclusion that the defendant was aware of his actions, is not dispositive where mental impairment may have affected the defendant's awareness. The defendant and the victim had spent the day and evening drinking alcohol and taking drugs. There was a fight, and "the defendant used his pocket knife to slash the victim twenty-three times about the face, head, ears, and neck." *Id.* at 296. The police picked up the defendant after receiving a call. He appeared intoxicated, was bloodied and crying when he asked about the charges against him, but stopped crying when informed he was only in protective custody. While in custody, he gave false statements about his activities of that day. The defendant's expert opined that the defendant was a chronic alcoholic who on the day in question was likely intoxicated from ingesting alcohol and Xanax, would likely experience memory loss, and could have been hallucinating, although there was no evidence about the defendant's susceptibility to hallucinations. The defendant claimed that, as a result of his intoxication, "he could not remember the killing and, in any event, he did not intend to do so;" he recalled no events between the time of the incident and when he awoke in a jail cell. *Id.* at 295.

one of his assailants, thrown one against a wall and grabbed the arm of the guy with the knife "to try to stop anybody getting hurt." He then had blacked out and was unable to "remember anything." The defendant turned himself in when he learned, the next day, that one of his assailants had died.

In light of strong and credible evidence of the defendant's mental impairment and severe intoxication that combined to cause memory loss and a state of hallucination, the risk is substantial that the jury found the defendant incapable of forming the intent to kill or inflict grievous bodily harm, and determined that his knowledge of the circumstances was limited to an awareness (if he had any at all[4] ) of "decking" an assailant, throwing an assailant against the wall, and attempting to disarm one who held a knife, conduct sufficient to result in serious harm, not death.

There is additional support for the view that the jury were misled, and the conclusion that there was in this case a substantial risk of miscarriage of justice. The erroneous third prong malice instruction was repeated eight times during the charge, and the jury, indicating their confusion, asked "What are the requirements for malice aforethought?" They were again given the defective instruction. The judge also included the erroneous "grievous bodily harm" or "injury" language when he further instructed on the effects of intoxication in connection with third prong malice. There is no mistaking that the message, pervading the charge, was that the jury could convict the defendant of second degree murder on the basis of conduct that risked only grievous bodily harm.

The third prong malice instructions were also incorrect when, on three of the eight occasions in which the instruction was given, the judge instructed that malice could be inferred from the *doing* of an act, rather than from the defendant's *knowledge* of the circumstances. For example, he said, on one such occa-

---

[4]Cf. *Commonwealth* v. *Sama*, 411 Mass. at 301 n.2 ("During their deliberations, the jury asked the judge to explain what he meant when he told them they could not consider the effect of the defendant's intoxication in relation to the third prong of malice. In responding to the question, the judge suggested that the evidence of the defendant's debilitating intoxication, if believed, would permit the jury to find that the defendant had no knowledge of the circumstances. This instruction touched on a proper statement of the law").

sion: "Malice aforethought also includes an unexcused . . . general intent — not specific intent — an unexcused *general intent to do an act* creating a plain and strong likelihood that death or grievous bodily harm would follow." The jury were thus instructed that what the defendant actually did was sufficient to create a risk of grievous bodily harm regardless of his ability to perceive or understand what he was doing or had done. By instructing the jury that they could return a verdict of second degree murder merely upon proof that the defendant's conduct was likely to cause grievous bodily injury, the live issue at trial was effectively eliminated from the jury's consideration.

Further, the error in the third prong malice instruction could have been compounded by the instruction, given twice, that permitted the jurors to infer malice from the intentional use of a dangerous weapon, without more, defining dangerous weapon as "any instrument which, by its construction or its use, is capable of causing death or grievous bodily injury, or one which could be perceived by a reasonable person as being so capable."[5] Compare *Commonwealth* v. *Farrell*, 322 Mass. 606, 614-615 (1948) (defining dangerous weapon for purposes of assault and battery as "any instrument or instrumentality so constructed or so used as to be likely to produce death or great bodily harm").[6]

Nor did the judge specifically instruct (he was not asked to do so) that, in determining whether the defendant intended to use a dangerous weapon, the jury should consider any credible evidence of mental impairment or intoxication. Model Jury Instructions on Homicide 61 (1999). Neither did he give any supplemental instruction that, whenever the Commonwealth *must* prove intent or knowledge, the jury should consider such evidence of impairment or intoxication in determining whether

---

[5]Our courts have said that it is correct to instruct that "[m]alice may be inferred — it does not have to be — from the intentional use of a dangerous weapon." *Commonwealth* v. *Roderick*, 429 Mass. 271 (1999). See also the Model Jury Instructions on Homicide 61 (1999) ("As a general rule, you are permitted to infer that a person who intentionally uses a dangerous weapon on another person is acting with malice").

[6]Such an instruction would permit a jury to infer malice, in the absence of evidence that the defendant intended to kill or to inflict grievous bodily harm, based on the intentional use of a weapon capable only of inflicting grievous bodily harm.

the Commonwealth has met its burden. *Commonwealth* v. *Sires*, 413 Mass. 292, 300 (1992) ("All that we have ever required be said to juries about the effect of drug consumption on a defendant's intent or knowledge would be satisfied by a simple instruction that the jury may consider credible evidence of the effects of the defendant's consumption of drugs in deciding whether the Commonwealth had met its burden of proving the defendant's state of mind beyond a reasonable doubt"), citing *Commonwealth* v. *Murphy*, 426 Mass. 395, 400 (1998). See *Commonwealth* v. *Glass*, 401 Mass. 799, 810 (1988) ("A jury should not . . . be foreclosed from considering the effects of voluntary consumption of alcohol on the proof of any crime which requires proof of a defendant's specific intent"). The dangerous weapon instruction as given in this case permitted the jury to infer malice without considering whether the defendant's impairment precluded his forming the requisite intent to use such a weapon.

For the foregoing reasons, I think the risk was substantial that the defendant was convicted on the basis of conduct, insofar as that conduct was known to the defendant, that could only have supported a conviction of manslaughter and not second degree murder. I would reverse.