NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13394

COMMONWEALTH  vs.  WILLIAM F. McDERMOTT.


Norfolk.     October 2, 2023. - January 25, 2024.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.[1]


Homicide.  Evidence, Cross-examination.  Practice, Criminal,
    Postconviction relief, Conduct of prosecutor, Cross-
    examination by prosecutor, Argument by prosecutor,
    Instructions to jury, Sentence.  Estoppel.  Constitutional
    Law, Sentence.  Due Process of Law, Sentence.



Indictment found and returned in the Superior Court
Department on November 30, 1981.

Following review by this court, 393 Mass. 451 (1984), a
motion for a new trial, filed on October 27, 2020, was heard by
Brian A. Davis, J.

The Supreme Judicial Court granted an application for
direct appellate review.


K. Hayne Barnwell for the defendant.
Michael McGee, Assistant District Attorney, for the
Commonwealth.
The following submitted briefs for amici curiae:

_____

[1] Justice Cypher participated in the deliberation on this
case prior to her retirement.

Stephen Cook, of California, W. Lydell Benson, Jr., of New York, Eileen Hren Citron, William A. Bejan, & Leslie Epstein Wallace, of the District of Columbia, Radha Natarajan, & Katharine Naples-Mitchell for New England Innocence Project & another.
Jeremy M. McLaughlin & Andrew J. Wu, of California, Nicholas N. Chan & Krishna Hedge, of Pennsylvania, & Peter W. Shanley for Massachusetts LGBTQ Bar Association & others.
Stanley Donald, pro se.

GAZIANO, J.  In 1982, a Superior Court jury convicted the defendant, William F. McDermott, of murder in the first degree. On direct review, we held that the trial judge had erred in failing to instruct the jury that evidence of intoxication could be considered in determining whether the defendant acted with extreme atrocity or cruelty as to support a verdict of murder in the first degree.  See Commonwealth v. McDermott, 393 Mass. 451, 459, 461 (1984).  Rather than ordering a new trial, the court exercised its authority pursuant to G. L. c. 278, § 33E, and reduced the verdict to murder in the second degree "given the entire posture of the case."  Id.  Mitigating factors included that the defendant was "just seventeen years old at the time of the incident, academically deficient, with some drug and alcohol problems . . . and [had] a poor relationship with his father." Id. at 460-461.  The court also noted the defendant's "sexual confusion" and evidence that he killed the victim "following, and in fear of repetition of, an anal rape."  Id. at 461.

In 2020, the defendant filed a second motion for a new trial, raising three issues:[2] first, the prosecutor's cross-examination and closing argument inserted homophobic invective into the case and were otherwise highly inflammatory; second, the judge failed to instruct the jury properly on self-defense, excessive use of force in self-defense, sudden provocation, and sudden combat; and third, a sentence of life with the possibility of parole, imposed on an individual seventeen years old at the time of the fatal shooting, is prohibited by the Eighth Amendment to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights. While finding that the prosecutor engaged in misconduct, a Superior Court judge (motion judge) nonetheless denied the motion for postconviction relief without an evidentiary hearing.

We adopt the motion judge's finding of prosecutorial misconduct. Although the prosecutor had a right to challenge the defense, which focused on the victim's alleged undisclosed sexual orientation and workplace sexual assault, portions of the cross-examination and closing argument went beyond the bounds of

---

[2] In his first motion for a new trial, filed in 2004, the defendant argued that the trial judge's jury instructions on malice aforethought and provocation erroneously shifted the burden of proof. A Superior Court judge denied the defendant's motion, and that decision was affirmed by the Appeals Court in an unpublished opinion. See Commonwealth v. McDermott, 65 Mass. App. Ct. 1112 (2006). This court denied further appellate review. See 446 Mass. 1104 (2006).

a permissible response.  Despite these transgressions, we conclude that the errors arising from the prosecutor's misconduct, considered in context of the overwhelming evidence against the defendant and its likely influence on the verdict, did not create a substantial risk of a miscarriage of justice. Next, we hold that the defendant's challenges to the self-defense jury instructions are estopped by prior postconviction rulings, and any error in the provocation jury instructions did not create a substantial risk of a miscarriage of justice. Finally, we conclude that neither the Eighth Amendment nor art. 26 bars the defendant from serving a sentence of life with the possibility of parole after fifteen years for the crime of murder in the second degree.  Accordingly, the denial of the defendant's motion for a new trial is affirmed.[3]

Background.  1.  Facts.  a.  Commonwealth's case.  In the fall of 1981, the seventeen year old defendant met Robert Kemp, the manager of the Cohasset Golf Club (club).  Kemp, sometime in October 1981, hired the defendant as a maintenance worker.  At the time, Kemp owned a .22 caliber Sentinel revolver with a capacity of nine rounds.  He kept the firearm in a filing

---

[3] We acknowledge amicus briefs submitted by the New England Innocence Project and the Criminal Justice Institute at Harvard Law School; the Massachusetts LGBTQ Bar Association, GLBTQ Legal Advocates & Defenders, and the Massachusetts Association of Criminal Defense Lawyers; and Stanley Donald.

cabinet in his office. The filing cabinet also held a box containing petty cash in an amount ranging from one hundred dollars to $500.

On November 20, 1981, at around 1 P.M., one of Kemp's friends visited him at work. When the friend left, between 2:30 P.M. and 3 P.M., he observed Kemp's car parked in the parking lot. An hour later, a club member arrived to pick up meat he had purchased from the club. While Kemp and the club member spoke in the kitchen, the defendant carried two boxes of meat to the club member's car, placing the boxes behind the car. The defendant then returned to work. The club member described the defendant as a considerate and polite young man.

At approximately 4 P.M., Kemp called his wife, who expected him home at around 5:30 P.M. When Kemp did not come home that evening, his wife searched for him all night and into the early morning hours without success. Meanwhile, at 8:30 P.M., Marshfield police observed Kemp's car parked near a burned-down church in the Green Harbor section of town but had no reason at the time to investigate. The car remained parked there overnight.

The club's chef reported for work the next morning. He observed blood droplets on the kitchen floor, a towel soaked in blood under the sink, a bloody squeegee beside the sink, and Kemp's eyeglasses on the floor behind a pan rack. The chef

alerted the police.  Responding police officers noticed additional blood spots near the stairs leading into the club and bloody drag marks on a hallway carpet.  They located Kemp's revolver outside the kitchen atop a stone wall below a deck.  It contained three spent cartridge casings (one casing within the chamber directly under the hammer and the other two side-by-side) followed by six consecutive empty chambers.  The officers observed two bullet holes in the kitchen -- one projectile had passed through a wooden door and the other impacted a concrete block wall.

That afternoon, a neighbor discovered Kemp's body in a ditch within a wooded area near the eighteenth hole of the golf course.  Kemp was fully clothed with the pockets of his pants turned inside out.  Missing were his wedding band, gold watch, and wallet.  Police found four spent .22 caliber cartridge casings on the ground near Kemp's body.  Kemp died from eleven or twelve gunshot wounds:  four to the right side of his head, one to his right cheek, two to his chest, four to his back, and one that exited his torso and lodged into his right elbow.  A State police ballistician opined that the eleven projectiles removed from Kemp's body, as well as the spent cartridge casings found in the revolver and near the body, were fired from Kemp's revolver.

While searching Kemp's car, investigators found the club's petty cash box and bloodstains on the back seat. Outside the vehicle in a wooded area, police also located two sets of keys to the car and Kemp's bloodstained jacket, which had six bullet holes in the upper body area.

At the time of the shooting, the defendant lived with his parents approximately two miles from the church parking lot. In a search of the defendant's bedroom, various bloodstained articles of clothing -- including jeans, underwear, shoes, and a jacket -- were discovered. On November 23, 1981, the defendant was arrested at his sister's house in Pennsylvania, where he had fled the day after the fatal shooting.

b. <u>Defendant's version</u>. The defendant testified that he met Kemp in September 1981 while he was hitchhiking to a party in Marshfield. Later that day, Kemp offered the defendant a "big money" maintenance job at the club. Within a few days, the defendant called Kemp to follow up on the job offer. Kemp picked up the defendant at a fast-food restaurant, bought him alcohol, and offered the defendant thirty dollars if Kemp could perform oral sex on him. The defendant agreed, and they drove to a nearby cemetery. The defendant was unable to become aroused during the sex act, but Kemp paid him anyway.

On October 2, 1981, the defendant, accompanied by his girlfriend, filled out a job application at the club.

Afterward, the three of them went to a bar, where Kemp got the defendant alone and begged to perform oral sex on him. After dropping off the defendant's girlfriend, Kemp and the defendant snorted cocaine purchased by Kemp and attempted to have oral sex. Kemp, once again, paid the defendant thirty dollars.

The pattern continued over the next three weeks or so: Kemp supplied the defendant with alcohol and narcotics, placed his mouth on the defendant's penis, and gave him thirty dollars each time. Kemp also pressured the defendant for anal sex, asking the defendant to let Kemp "put it up [his] bum." One time, Kemp bragged about knowing "people in Rhode Island" who break legs, cut off "pricks," and stuff them in their victim's mouths.

On November 20, 1981, the defendant telephoned Kemp to see if he was needed at work. Kemp told the defendant to finish painting the women's bathroom and that he would pay his taxicab fare. The defendant arrived at around 1:30 P.M. Kemp was inside his office talking to a friend. The defendant consumed a mixed drink, served by Kemp, and went upstairs to the second floor to paint the bathroom. While working, the defendant drank a few more mixed drinks and smoked marijuana.

After completing the painting, the defendant was on a ladder removing tape from the ceiling when Kemp entered the bathroom. Kemp grabbed the defendant by the penis and told him

he needed to comply to keep both his job and his "prick." The defendant testified:

> "[H]e forced me down on the couch and took off my pants, and he put his penis in my bum. He had his hands wrapped around me -- around my waist. . . . He [then] got up and left for some reason. He threw me a hundred-dollar bill and told me I liked it."

The defendant was frightened, felt violated, and was in pain from the sexual assault. He also felt disorientated from the alcohol and drugs he had consumed earlier that day.

The defendant dressed and went downstairs to the kitchen, where Kemp was speaking to a club member. The defendant carried meat to the club member's car. He attempted to enter the car, but the doors were locked. He then returned to the kitchen. As soon as the club member left, Kemp grabbed the defendant by his hair and jacket, and kicked him on the backside. Kemp insisted that they "finish." They returned to the second-floor bathroom, where Kemp ordered the defendant to remove his pants. The defendant managed to break free from Kemp by telling him that he needed to use the bathroom. Kemp removed his revolver from his waistband, slamming it down on the vanity.

The defendant grabbed the firearm and ran downstairs to the kitchen. Kemp chased after him. The defendant tripped, fell on the ground, and fired the revolver in Kemp's direction as he got up. He did not aim the firearm, nor did he see Kemp as he fired. Kemp fell to the kitchen floor.

The defendant was confused and disoriented. In this panicked state, he attempted to clean up the blood spilled from Kemp's body. He then dragged Kemp outside and into the car. The defendant dropped Kemp's body in a ditch by the side of the road. He denied shooting Kemp while he was in the ditch or reloading the nine-shot revolver. He also denied rummaging through Kemp's pockets or stealing his money or jewelry. The defendant drove to Marshfield, parked in a church parking lot, tossed the keys into a wooded area, and walked home. The next day, after purchasing a train ticket with the one hundred dollar bill Kemp had thrown at him, he traveled to Pennsylvania.

The defendant called Peter Werner to testify that Kemp was not open about his sexual orientation and used his position as club manager to proposition young men. Werner, age twenty-two, described a sexual encounter with Kemp at a highway rest area on or around October 20, 1981. Werner stopped at the rest area to meet other men. He met an individual, matching Kemp's description, who introduced himself as "Robert Kemp" and wore a windbreaker embroidered "Bob" and a "Cohasset Golf Club" cap. Kemp asked Werner if he wanted to "fool around." They walked to a remote area where Kemp paid Werner thirty dollars so that Kemp could perform oral sex on him. Kemp "began to blow" Werner, but Werner could not get an erection because Kemp "didn't turn [him] on." Werner testified, "I then proceeded to masturbate myself,

and he did the same to himself." Prior to the sex act, Kemp offered Werner a maintenance job. They met again, by chance, a week later at another rest area. Werner explained that he did not pursue the job opportunity because he knew that Kemp would demand sex "all the time."

c. Rebuttal evidence. The Commonwealth called several witnesses on rebuttal. Kemp's wife testified that they were married for fourteen years and had three children, ages five, nine, and twelve. She had no suspicions that her husband was gay. A seventeen year old club employee testified that Kemp did not proposition him and that he never observed Kemp supply the defendant with alcohol. In addition, a State police trooper, who interviewed Werner before trial, testified to Werner's prior inconsistent statements. Werner told the officer that the incident took place "sometime in September of 1981," and that the man introduced himself as "Bob" (not "Robert Kemp"). Describing the encounter, Werner stated that Kemp offered to fellate him in exchange for twenty dollars. Werner did not want to have oral sex with Kemp, so they "struck a bargain" for Kemp to masturbate in Werner's presence for the fee of twenty dollars.

2. Prior proceedings. A grand jury returned indictments charging the defendant with murder in the first degree, G. L. c. 265, § 1, and armed robbery, G. L. c. 265, § 17. Following a

nine-day trial, a Superior Court jury convicted the defendant of murder in the first degree and acquitted him of armed robbery. On direct appeal, this court exercised its authority under G. L. c. 278, § 33E, and ordered the verdict reduced to murder in the second degree.  See McDermott, 393 Mass. at 459, 461.

On August 3, 2004, the defendant filed his first motion for a new trial, alleging that the trial judge's malice and provocation instructions impermissibly shifted the burden of proof.  The motion judge denied the defendant's request for postconviction relief, which was affirmed by the Appeals Court in an unpublished decision in 2006.  See Commonwealth v. McDermott, 65 Mass. App. Ct. 1112 (2006).  This court denied the defendant's application for further appellate review.  See 446 Mass. 1104 (2006).

The defendant, in October 2020, filed his second motion for a new trial, and a motion to stay execution of his sentence.[4]  He subsequently, in March 2021, filed a motion for alternative relief, requesting a reduction to manslaughter under Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995).  On May

---

[4] A Superior Court judge denied the defendant's motion to stay the execution of his sentence, in which the defendant sought release due to the dangers of COVID-19.  See Commonwealth v. McDermott, 488 Mass. 169, 170 (2021).  A single justice of the Appeals Court affirmed the denial of that motion, based on the defendant's serious flight risk, and we upheld that order. Id. at 170, 172.

26, 2022, the motion judge denied the defendant's second motion for a new trial and his motion to reduce the verdict. The defendant filed a timely appeal from the decision, and we allowed his petition for direct appellate review.

Discussion. 1. Standard of review. The defendant did not object to the prosecutor's closing argument, the contested jury instructions, or most of the disputed cross-examination at trial. The defendant also did not raise any of these issues in his direct appeal or in his first motion for a new trial. In these circumstances, we review to determine whether any of the alleged errors created a substantial risk of a miscarriage of justice. See Commonwealth v. Randolph, 438 Mass. 290, 294-295 (2002); Commonwealth v. Azar, 435 Mass. 675, 687 (2002), S.C., 444 Mass. 72 (2005), citing Commonwealth v. LeFave, 430 Mass. 169, 174 (1999).

A substantial risk of a miscarriage of justice exists where we have "a serious doubt whether the result of the trial might have been different had the error not been made." Azar, 435 Mass. at 687, quoting LeFave, 430 Mass. at 174. This standard of review considers "(1) the strength of the Commonwealth's case, (2) the nature of the error, (3) the significance of the error in the context of the trial, and (4) the possibility that the absence of an objection was the result of a reasonable tactical decision" (citation and alteration omitted).

Commonwealth v. Desiderio, 491 Mass. 809, 815-816 (2023). See Randolph, 438 Mass. at 297 ("Errors of this magnitude are extraordinary events and relief is seldom granted"); Azar, supra (new trial based on unpreserved error is "extraordinary situation").

The Commonwealth contends that the defendant's appeal is "foreclosed" by this court's plenary review in 1984. That argument only goes so far. "Section 33E, the mechanism by which this court exercises plenary review of all convictions of murder in the first degree, provides this court with extraordinary powers to consider the whole case, both the law and the evidence, to determine whether there has been any miscarriage of justice" (quotations and citation omitted). Commonwealth v. Watt, 493 Mass. 322, 326 (2024). Reversible error is unlikely where "the defendant's conviction in a capital case has undergone the exacting scrutiny of plenary review under § 33E." Randolph, 438 Mass. at 297. See Commonwealth v. Watkins (No. 1), 486 Mass. 801, 805, S.C., 486 Mass. 1021 (2021). Notwithstanding the court's exacting level of review, postconviction relief under the substantial risk of a miscarriage of justice standard is not entirely foreclosed. Id. "Although this court takes its § 33E review obligation seriously and conducts a thorough review to the best of its ability, no one is infallible. . . . [W]e must maintain a means of

addressing the possibility of error and of grave and lingering injustice" (quotations and citations omitted).  Id.  See Commonwealth v. Smith, 460 Mass. 318, 320 (2011).

 2.  Prosecutorial misconduct.  We first consider whether the prosecutor's cross-examination and closing argument crossed the line that separates strong advocacy from prohibited misconduct.  Most pointedly, the defendant asserts that the prosecutor convinced the jury to convict by "wield[ing] homophobic invective."  He claims also that the prosecutor engaged in other prohibited tactics, including asking questions designed to badger or harass the defendant and playing to the jury's sympathy for the victim in the closing argument. Although the Commonwealth concedes that some of the prosecutor's tactics were improper, it contends that the defendant is unable to demonstrate a substantial risk of a miscarriage of justice because of the overwhelming evidence of his guilt.[5]

---

[5] The Commonwealth introduced the defendant's statements before the parole board to cast doubt on the truthfulness of his defense.  In these proceedings, the defendant disavowed his trial testimony.  He testified, in 2012 and 2019, that the self-defense claim was a lie -- that is, that Kemp did not rape him, and that the defendant's attorney procured Werner's testimony. It would not be in the interest of justice, the Commonwealth argues, to grant the defendant a new trial considering his admission to fabricating a defense.  The defendant objected to the consideration of the parole board evidence, contending that the statements are irrelevant or of dubious value considering his incentive to mollify parole officials.  See Commonwealth v. Clark, 528 S.W.3d 342, 347-348 (Ky. 2017) (expressing doubt over

a.  <u>Cross-examination</u>.  A defendant who voluntarily takes the witness stand to testify on his own behalf is subject to "the ordinary rigors of proper cross-examination."  <u>Commonwealth</u> v. <u>Rivera</u>, 425 Mass. 633, 639 (1997).  See <u>Commonwealth</u> v. <u>Santiago</u>, 53 Mass. App. Ct. 567, 573 (2002).  There are, however, limits to cross-examination.  See <u>Commonwealth</u> v. <u>Fahey</u>, 99 Mass. App. Ct. 304, 309 (2021).  Among those limitations:  (1) "a prosecutor may not ask the defendant a question for which the prosecutor cannot reasonably expect the witness to provide an affirmative answer in order to communicate an impression . . . by innuendo"; (2) the defendant cannot be asked to assess the credibility of another witness; and (3) a prosecutor may not ask the defendant questions that only serve "to harass, annoy or humiliate" (quotation and citations omitted).  <u>Id</u>. at 310.

---

reliability of admissions "induced solely by the yearning to be free").  Here, the motion judge found that the defendant's admissions "may be probative," and that such evidence "arguably take[s] some of the sting" out of the prosecutor's misconduct. We leave for another day the issue whether the Commonwealth may introduce admissions before the parole board in a motion for a new trial.  Where, as here, the motion judge did not preside over the trial or conduct an evidentiary hearing, we review his decision de novo.  <u>Commonwealth</u> v. <u>Pope</u>, 489 Mass. 790, 793-794 (2022).  Thus, we rely on the trial transcripts and other documentary evidence, absent the parole board admissions, to determine whether the asserted error or errors created a substantial risk of a miscarriage of justice.

We first address the prosecutor's questions concerning the defendant's sexual orientation. To test the credibility of the defendant's version of the facts, the prosecutor asked the defendant, in essence, why he continued to work for Kemp if sex was a condition of employment. The defendant answered that Kemp continued to pay him thirty dollars for oral sex and "I guess I told [Kemp] it was all right, because he did it." The prosecutor then inquired into the defendant's sexual orientation:

> Q.: "Did you ever have homosexual sex with other people -- "
>
> A.: "No."
>
> Q.: "-- before that?"
>
> A.: "No."
>
> Q.: "Any familiarity with homosexuals?"
>
> A.: "No."
>
> Q.: "Up to that point; are you sure?"
>
> A.: "Yes."
>
> Q.: "Did you ever hear of a place named 'Skippers'?"
>
> A.: "No."
>
> Q.: "Did you?"
>
> A.: "No."

Following this exchange, defense counsel asked for a side bar conference. He informed the judge that the Commonwealth had

not provided any pretrial discovery linking the defendant to "Skippers." Counsel requested an offer of proof "to see if that is fair cross-examination." The prosecutor explained that Skippers is a "homosexual bar," and that he had "soft information" that the defendant "may have been there." The trial judge did not accept the Commonwealth's offer of proof. He stated that "it certainly isn't appropriate to ask a question of a witness if you know, or if you understand that in the event that he answers in the negative, that you're not going to be able to show some evidence of it." He promised, "[a]t some point," to provide an appropriate jury instruction "with reference to that." The judge did not do so.

The prosecutor, as the Commonwealth now concedes, made inappropriate insinuations regarding the defendant's sexual orientation without foundation. It is error, as we explained in Commonwealth v. Fordham, 417 Mass. 10, 20-21 (1994), for a prosecutor "to communicate impressions by innuendo through questions which are answered in the negative . . . when the questioner has no evidence to support the innuendo. A prosecutor may not conduct cross-examination in bad faith or without foundation" (quotations and citations omitted). See Commonwealth v. Trotto, 487 Mass. 708, 734 (2021); Commonwealth v. Christian, 430 Mass. 552, 559-561 (2000), overruled on other grounds by Commonwealth v. Paulding, 438 Mass. 1 (2002).

Moreover, this line of questioning was premised on homophobic stereotyping. The Commonwealth suggested that tolerance of workplace sexual harassment varied according to sexual orientation. That is, according to the Commonwealth, a heterosexual employee (as the defendant claimed to be through his counsel) would have quit. See Commonwealth v. Cadet, 473 Mass. 173, 186 (2015), citing Mass. G. Evid. § 1113(b)(3)(C) note (2015) (biased questions raising racial, ethnic, or gender stereotypes inappropriate); Commonwealth v. Capone, 39 Mass. App. Ct. 606, 611 (1996) ("error for a prosecutor to make insinuations about a defendant's sexual orientation which are likely to prejudice a defendant").

The prosecutor also badgered the defendant during cross-examination by asking hostile and repetitive questions. See Commonwealth v. Johnson, 431 Mass. 535, 540 (2000). For example, the defendant testified that he shot blindly at Kemp. Expressing incredulity (given the number of well-placed gunshot wounds), the prosecutor asked, "You didn't see him while you were shooting him?" The defendant responded, "No, I wasn't looking at him." The prosecutor countered, "You're a pretty good shot." Later, the trial judge offered to "take the recess now and cool the court room down a little."

While we therefore agree with the motion judge that the prosecutor's insinuations and badgering were improper, not all

the motion judge's characterizations of the prosecutor's cross-examination are accurate. Specifically, the motion judge found that the prosecutor "tempt[ed]" the defendant into commenting on the credibility of police officers. See Commonwealth v. Triplett, 398 Mass. 561, 567 (1986) (prosecutor baited defendant into calling his own mother, who offered different version of facts, liar); Fahey, 99 Mass. App. Ct. at 310 (prosecutor asked defendant, "So, you're telling the truth and no one else is?"). We disagree with this characterization of the testimony. The prosecutor asked:

Q.: "Now, you heard Lieutenant McGuinness testify before this jury, didn't you?"

A.: "Yes."

Q.: "And you heard Sergeant Rhodes of the Cohasset police testify also, correct?"

A.: "Yes."

Q.: "Do you remember Sergeant Rhodes saying that there were three empty casings in this weapon when he found it on the wall?"

A.: "Yes."

Q.: "How did that happen?"

[objection overruled]

A.: "I don't know."

Q.: "Well, how many times did you shoot Robert Kemp?"

A.: "I don't know."

Q.: "You heard Sergeant McGuinness testify that there were four casings in the vicinity of where the body was found. Do you remember that testimony?"

A.: "Yes."

Q.: "And that those four casings were fired from that gun? You heard that, didn't you?"

A.: "Yes."

Q.: "Didn't you shoot Robert Kemp when you had him in the ditch?"

A.: "No."

The defendant testified that he did not know how many rounds he fired. He also denied shooting Kemp in the wooded area. The prosecutor confronted the defendant with undisputed ballistics evidence, including the revolver's nine-shot capacity and the number of gunshot wounds and expended shell casings. The defendant was not asked whether the crime scene investigators lied. Referencing the testimony of those police officers, he was asked to explain how the nine-shot revolver was emptied, and to square his version of the facts with the shell casings recovered next to the body. "It is not improper for the prosecutor to point out, through this line of questioning, that there were inconsistencies between the defendant's testimony and that of [other witnesses], so long as the defendant was not asked to assess the credibility of the [witness's] testimony" (quotation and citation omitted). Commonwealth v. Alphas, 430 Mass. 8, 18-19 (1999). See Commonwealth v. Wright, 411 Mass.

678, 687 (1992), S.C., 469 Mass. 447 (2014) (no error where questions "do not involve any direct request of [the defendant] to comment on the credibility of witnesses").

b. Closing argument. The prosecutor made two improper remarks in his closing argument. First, he played to the jury's potential bias against gay men by dismissing Werner as a "male prostitute," and telling the jury that Werner was "very proud of the fact he is gay. Fine. Great. That's not the issue here." See Commonwealth v. Tate, 486 Mass. 663, 674 (2021) (arguments that invoked racial biases "grossly improper"); Commonwealth v. Rivera, 52 Mass. App. Ct. 321, 328 (2001) (argument "went too far" by prejudicial name-calling). Second, the prosecutor inappropriately appealed to the jury's sympathy for the victim. He argued, "[The defendant] had to come up with something; he had to. It's an overwhelming case. He murdered him, and he robbed him. Unfortunately for the memory of Robert Kemp, think of what this man has come up with." See Commonwealth v. Bois, 476 Mass. 15, 34 (2016) ("Prosecutorial appeals to sympathy . . . obscure the clarity with which the jury would look at the evidence and encourage the jury to find guilt even if the evidence does not reach the level of proof beyond a reasonable doubt" [quotation omitted]).

c. Substantial risk of miscarriage of justice. The Commonwealth concedes prosecutorial misconduct. The motion

judge aptly observed, "If [the d]efendant's entitlement to a new trial turned solely on whether the prosecutor engaged in misconduct at his original trial, the [c]ourt would allow [the d]efendant's [s]econd [m]otion.  That, however, is not the standard."  Applying the standard of review for unpreserved claims, we conclude that the defendant has not demonstrated a substantial risk of a miscarriage of justice.  On these facts, notwithstanding improprieties in the prosecutor's cross-examination and closing argument, this case does not warrant a new trial.  See Randolph, 438 Mass. at 297.

We first examine the strength of the Commonwealth's case. See Desiderio, 491 Mass. at 815-816; Azar, 435 Mass. at 687. The record supports the conclusion that there was overwhelming evidence of guilt.  The motion judge found, and we agree, that

> "[n]otwithstanding anything that the prosecutor did or said at [the d]efendant's trial, it remains undisputed that [the d]efendant shot Kemp ten to eleven times -- including five times to the face and head -- with a nine-shot [r]evolver. Because [the d]efendant fired ten or eleven shots into Kemp's body with a nine-shot weapon, it also is true that [the d]efendant undeniably had the opportunity and the presence of mind, in the midst of killing Kemp, to stop and reload the [r]evolver at least once."

There was also strong evidence rebutting the defendant's narrative of events.  For example, he testified that he shot Kemp while falling, and did not aim the revolver or even see Kemp before pulling the trigger.  Yet he fired multiple fatal shots, striking Kemp in vital areas of his body.  He also

testified that he did not rifle through Kemp's pockets, leading to an unbelievable "grave robber" argument that teenagers partying in the woods spotted Kemp's body in the ditch overnight and stole his wallet and jewelry.[6]  Further, the defendant's testimony that he did not shoot Kemp in the ditch was contradicted by the presence of shell casings near the body.

We next examine the second and third Desiderio and Azar factors.  It goes without saying that cross-examination or a closing argument that plays on a juror's potential homophobic bias has no place in a criminal trial.  Whether misconduct leads to a new trial on collateral review, however, depends on the nature of the errors and the significance of the errors in the

---

[6] The jury acquitted the defendant of armed robbery and felony-murder.  See McDermott, 393 Mass. at 457 (jury "clearly" rejected felony-murder).  These verdicts, however, do not foreclose a finding that the defendant rummaged through Kemp's pockets and stole the petty cash box.  It is a question of when the defendant formed the intent to steal, not whether he stole from Kemp.  The judge instructed the jury that the Commonwealth was required to prove the defendant formed an intent to steal prior to the shooting, not afterward.  He instructed: "[S]peaking just hypothetically, depending upon how you might view the evidence, certainly if he took property from Robert Kemp or from his body after the fact of a killing and did not have the specific intent at the time of the killing to rob from him, then that crime would not be armed robbery."  See Commonwealth v. Roderick, 429 Mass. 271, 277 (1999) (felony-murder applies where killing occurred during commission or attempted commission of predicate felony).

context of the trial.  See Desiderio, 491 Mass. at 816; Azar, 435 Mass. at 687.[7]

The defense alleged that Kemp hid his sexual orientation and used his position as golf course manager to take advantage of younger men.  In so doing, the defense appealed to homophobic tropes.  What began as "homosexual seduction," as defense counsel stated, "resulted in a degrading[] defilement, and on November 20[], the homosexual rape of Billy McDermott."  Defense counsel emphasized that the defendant was a "real [heterosexual] boy" attacked by a larger, older gay man.  As evidence of the defendant's heterosexuality, his girlfriend testified that he "became aroused" in response to "heavy petting."  Defense counsel argued, "I'm glad I called [the defendant's girlfriend], because I think it really rounds out what we are dealing with here, a boy."  Defense counsel further stated that Werner's testimony, where Werner described consensual sex for a fee with Kemp, "contextualizes the horror of Billy McDermott."

The prosecutor was entitled to challenge the defendant's version of the facts and Werner's testimony concerning Kemp's alleged undisclosed sexual orientation.  This was a delicate task given the danger of importing bias into the trial.  He

---

[7] This case does not raise the fourth factor, i.e., "the possibility that the absence of an objection was the result of a reasonable tactical decision."  Desiderio, 491 Mass. at 816.

failed.  We conclude, however, that the prosecutor's "Skippers" question and reference to Werner's sexual orientation did not create a substantial risk of a miscarriage of justice.  The "Skippers" question was part of the prosecutor's ham-handed attempt to counter the defendant's narrative that an innocent "real" heterosexual boy, cornered in the bathroom, justifiably resorted to deadly force to repel an attack by an older, gay man.  In response to the prosecutor's question whether he was familiar with "Skippers," the defendant answered "no," the prosecutor moved on to another topic, and the judge effectively curtailed further inquiry.  See Christian, 430 Mass. at 560-562 (prosecutor questioned defendant "at some length" about incriminating statements made to nontestifying jailhouse informant drawing "consistent denials").  Similarly, in a lengthy closing argument, the derisive comments about Werner's sexual orientation were made in passing amid appropriate argument challenging Werner's testimony.

We next consider the prosecutor's inappropriate appeal to sympathy.  A prosecutor is afforded leeway to humanize the proceedings but not in a way that plays on the jury's sympathy and emotions.  Commonwealth v. Kolenovic, 478 Mass. 189, 201 (2017).  The absence of an objection, although not dispositive, is "some indication that the tone, manner, and substance of the now challenged aspects of the prosecutor's argument were not

unfairly prejudicial" (citation omitted). Commonwealth v. Duguay, 430 Mass. 397, 404 (1999). Here, the judge instructed the jury that closing arguments are not evidence and that the jurors were required to decide the case "without reference to any ignoble motive" such as "fear, prejudice, pity, [or] sympathy." See Commonwealth v. Kee, 449 Mass. 550, 560-561 (2007) (general jury instructions may mitigate prejudice). The potential damage to Kemp's reputation as a "family man" was front and center in the trial. He was either a rapist targeting young male employees, who hid his sexual orientation from his friends and family, or a murder victim unfairly sullied by the defense. "[I]t is unlikely that the prosecutor's argument had an inflammatory effect on the jury beyond that which naturally would result from the evidence presented" (quotation and citation omitted). Commonwealth v. Moore, 489 Mass. 735, 754 (2022). Finally, the prosecutor's aggressive questioning, in context, did not create a substantial risk of a miscarriage of justice. Having carefully reviewed the transcripts, we agree with the Commonwealth's contention that the length of the cross-examination was in many ways attributable to the prosecutor's legitimate goal of rebutting the defendant's statements during direct examination point by point. Further, the harsh tone of the prosecutor's questioning is not the type of error leading to a new trial in this procedural posture.

3.  Jury instructions.  The defendant next contends that the trial judge provided erroneous self-defense, sudden provocation, and sudden combat jury instructions.  In brief, he claims that the self-defense instructions "failed to place the burden squarely and continuously upon the Commonwealth," and that the sudden provocation and sudden combat instructions were incomplete.  The motion judge rejected these claims.  He concluded that these issues were "fully litigated and addressed by both [this court] and the Appeals Court in the course of [the d]efendant's prior appeals.  In other words, all of the requirements for the application of direct estoppel have been met."[8]

As a threshold issue, we consider whether the defendant should be estopped directly from challenging the jury instructions where the issues were decided in his first motion for a new trial and subsequent appeal.  "Under the principle of direct estoppel, a judge is precluded from reviewing an issue that previously was litigated and determined, if such determination was essential to the conviction, and the defendant

---

[8] We are not convinced that the burden of proving self-defense was litigated and determined in the direct appeal.  The McDermott court addressed the narrow self-defense issue whether the judge was required to instruct the jury that an individual may use deadly force to resist rape (as distinct from force used to resist death or serious injury).  See McDermott, 393 Mass. at 459-460.

had an opportunity to obtain review of the determination" (quotations and alterations omitted). Commonwealth v. Pfeiffer, 492 Mass. 440, 447 (2023), quoting Commonwealth v. Arias, 488 Mass. 1004, 1006 (2021).

The defendant's first motion for a new trial challenged impermissible burden-shifting language within the voluntary manslaughter instruction. The Commonwealth conceded that the judge failed to instruct the jury that the Commonwealth had to prove the absence of provocation beyond a reasonable doubt. In denying the motion for a new trial, the first motion judge found that the unobjected-to erroneous jury instruction did not create a substantial risk of a miscarriage of justice. "[I]t would have been better practice," she stated, "for the judge to instruct that the Commonwealth had to prove the absence of provocation beyond a reasonable doubt." She reasoned that the defendant was not prejudiced by the error because reading "the charge as a whole" (including the self-defense instruction) the judge repeatedly emphasized "that the Commonwealth bore the burden of proof, that it had to prove all elements beyond a reasonable doubt, and that the defendant bore no burden."

On the defendant's appeal from the denial of his first motion for a new trial, the Appeals Court considered the defendant's argument that "the judge incorrectly instructed the jury on the Commonwealth's burden of proof on provocation, which

created a substantial risk of a miscarriage of justice." McDermott, 65 Mass. App. Ct. 1112. The judge gave the jury the same burden-shifting instruction found to be prejudicial error in Commonwealth v. Acevedo, 427 Mass. 714, 716 (1998). "The correct rule is that, where the evidence raises the possibility that the defendant may have acted on reasonable provocation, the Commonwealth must prove, and the jury must find, beyond a reasonable doubt that the defendant did not act on reasonable provocation." McDermott, supra, quoting Acevedo, supra. The Appeals Court went on to decide whether the Acevedo error created a substantial risk of a miscarriage of justice requiring a new trial. Affirming the denial of the defendant's first motion for a new trial, the Appeals Court stated, "The error, which the Commonwealth concedes, did not create a substantial risk of a miscarriage of justice because the trial judge gave a lengthy and correct instruction on self-defense, in which he properly allocated to the Commonwealth the burden to prove the absence of self-defense." McDermott, supra. The Appeals Court further noted, "The judge gave a lengthy instruction on self-defense, in which he properly, forcefully, and repeatedly allocated to the Commonwealth the burden to prove the absence of self-defense." Id.

In this appeal, the defendant is estopped from relitigating the issue whether the judge properly allocated the burden of

proof in the self-defense instruction.  The claim was "actually litigated and determined" by the Appeals Court, and "such determination was essential to the [defendant's] conviction" (citations omitted).  Pfeiffer, 492 Mass. at 447.  The defendant's argument that the Appeals Court's statements concerning the correctness of the self-defense instruction "is nonbinding dicta" is unavailing.  Jury instructions are considered as a whole "to determine the probable impact, appraised realistically . . . upon the jury's factfinding function" (quotation and citation omitted).  Commonwealth v. Teixeira, 490 Mass. 733, 742 (2022).  Where the Appeals Court determined that the jury instructions, in their entirety, did not shift the burden of proof, the defendant is estopped from relitigating this claim.

Direct estoppel, however, does not bar the defendant from challenging jury instructions unrelated to the allocation of the burden of proof.  As such, we next consider the defendant's arguments that the trial judge failed to explain or define adequately the terms "sudden provocation" and "sudden combat." Because the issue is raised for the first time in this appeal,

we examine any alleged errors for a substantial risk of a
miscarriage of justice.[9]

The judge instructed:

"[M]anslaughter takes into account the human frailties of
human beings. . . .  It allows the jury to consider on the
totality of the evidence whether or not the perpetrator of
the crime was overcome by provocation at the time that he
committed the crime.  If so, was he so overcome?  Was he so
overcome with human emotion and human frailty and human
weakness based upon a provocation that he, indeed, acted
not out of response to deliberation, not out of response to
malice but out of response to human weakness, but,
nevertheless, committed an unlawful killing?"

In response to the jury's request to redefine manslaughter,
the judge provided a supplemental instruction:

"[The law] recognizes the weaknesses of human beings and
their frailties and their responses to sudden provocation
or sudden assaults in the heat of passion of mankind.  If
the jury find[] that there is, indeed, an unlawful killing
of another . . . but that that killing was after an assault

---

[9] The defendant, citing Commonwealth v. Harrington, 379
Mass. 446, 450 (1980), and Commonwealth v. Barros, 425 Mass.
572, 576 (1997), contends also that the judge erred by failing
to instruct the jury that intoxication mitigates the subjective
prong of self-defense.  The argument is not supported by either
case.  Harrington, supra, established that self-defense requires
evidence that a defendant reasonably and actually believed he
was in imminent danger of death or serious bodily harm.  In
Barros, supra, the court did not reach the issue whether a judge
is required to instruct the jury that they may consider
intoxication as it relates to the defendant's actual belief that
it was necessary to resort to deadly force.  It was not
necessary to resolve the issue, the Barros court concluded,
because the evidence did not warrant a self-defense instruction.
Id.  In any event, the absence of such an instruction would not
have created a substantial risk of a miscarriage of justice.  If
the jury had credited the defendant's version of events, he
would have had a reasonable and actual belief that deadly force
was necessary to protect himself from Kemp's sexual assault
regardless of his sobriety.

or a provocation upon the [d]efendant which resulted in the [d]efendant reacting in a heat of passion where judgment is, in effect, clouded by the heat of passion, then in fact in that situation the notion of malice that can be inferred from the intentional use of deadly force is negated, and the malice does not exist. In that situation the killing, rather than being murder, is manslaughter."

The defendant maintains that the court "should have, but did not convey, the precise and complete definitions of provocation and sudden combat that this [c]ourt had established before this trial." A more thorough definition, he argues, would have informed the jury that "sudden provocation included anger, fright and excitement as valid states of mind in this context to warrant a manslaughter verdict." See Commonwealth v. Walden, 380 Mass. 724, 728 (1980). See also Commonwealth v. Hodge (No. 2), 380 Mass. 858, 865 (1980) (manslaughter is homicide committed "in heat of blood, a perturbation of mind palliating the intent to inflict injury. The fatal blow not purposeful but is the result of chance and frailty of humanity"). This was a critical mistake, he argues, because Kemp initiated sudden combat by kicking the defendant and there was insufficient time between the defendant's justifiable anger and the shooting for "cool reflection."

Here, the instruction required the jury to consider whether the defendant's "judgment was clouded" so that he was "overcome with human emotion and human frailty and human weakness based on provocation." We conclude that any error in the provocation

instruction could not have created a substantial risk of a miscarriage of justice. The theory of the defense was that the defendant shot Kemp to fend off a brutal forcible rape. Defense counsel argued that the defendant, on cross-examination, was forced to relive the "torture" of November 20, 1981. The defendant, he argued, was alone, drunk, and afraid. "He was in pain, both from his knees and from his rectum. He was confused, degraded, demeaned, raped, and cornered." The jury would commonly understand that Kemp's alleged sexual assault constituted an act of provocation in the manner described by the judge.

4. Life with possibility of parole sentence. The defendant contends that a sentence of life with the possibility of parole, imposed on a teenager, violates the prohibition against cruel or unusual punishment secured by the Eighth Amendment and art. 26. Relying on Miller v. Alabama, 567 U.S. 460, 472 (2012), and Graham v. Florida, 560 U.S. 48, 73 (2010), he reasons that all former juvenile offenders, convicted of homicide or other serious offenses, are entitled to individualized sentencing hearings. In the defendant's view, a mandatory life sentence for murder in the second degree, even with the possibility of parole, "is constitutionally infirm due to the automatic process behind its imposition."

The defendant's Federal constitutional challenge fails because there is no Eighth Amendment prohibition against sentencing a juvenile offender to life with the possibility of parole. The United States Supreme Court, in a series of decisions spanning roughly twenty years, has recognized that children constitutionally are different from adults for purposes of sentencing. In Roper v. Simmons, 543 U.S. 551, 578 (2005), the Court held that capital punishment of offenders who were under the age of eighteen when their crimes were committed violates the "cruel and unusual punishment" clause of the Eighth Amendment. Following Roper, the Court examined the constitutionality of sentencing juveniles to "the second most severe penalty permitted by law" (citation omitted), Graham, 560 U.S. at 69 -- life imprisonment without parole. The Graham Court held that for "a juvenile offender who did not commit homicide[,] the Eighth Amendment forbids the sentence of life without parole." Id. at 74. Two years later, in Miller, 567 U.S. at 479, the Court held that the Eighth Amendment's probation against cruel and unusual punishment proscribes the imposition of a mandatory sentence of life without the possibility of parole for individuals under the age of eighteen at the time they committed murder. "[B]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of

disproportionate punishment."  Id.  Then, in Montgomery v. Louisiana, 577 U.S. 190, 212 (2016), the Court determined that Miller's substantive holding barring life without parole for all but the rarest of juvenile offenders was retroactive to cases on collateral review.  Most recently, in Jones v. Mississippi, 141 S. Ct. 1307, 1320-1321 (2021), the Court decided that the Eighth Amendment did not require a judge to make separate factual finding of permanent incorrigibility before imposing a discretionary sentence of life without parole on a juvenile homicide offender.

Because the defendant was sentenced to life with the possibility of parole after fifteen years, see G. L. c. 279, § 24, his sentence does not violate juvenile-specific Eighth Amendment protections.  It is well settled that a mandatory sentence to anything less than life without the possibility of parole is not prohibited by Miller.  See Montgomery, 577 U.S. at 212 (State may remedy Miller violation by permitting juvenile homicide offenders to be considered for parole, rather than resentencing them); Miller, 567 U.S. at 489 (mandatory lifetime incarceration without possibility of parole "regardless of . . . age and age-related characteristics" violates ban on cruel and unusual punishment); Graham, 560 U.S. at 75 ("State is not required to guarantee eventual freedom to a juvenile offender" but must provide "some meaningful opportunity to obtain release

based on demonstrated maturity and rehabilitation"). See also Brown v. Precythe, 46 F.4th 879, 886 (8th Cir. 2022) ("Miller factors . . . apply as a constitutional matter only to a judge's decision at sentencing whether to impose a term of life imprisonment without parole for a juvenile homicide offender"); Atkins v. Crowell, 945 F.3d 476, 478 (6th Cir. 2019), cert. denied, 140 S. Ct. 2786 (2020) ("Miller's holding simply does not cover a lengthy term of imprisonment that falls short of life without parole"); United States v. Sparks, 941 F.3d 748, 754 (5th Cir. 2019), cert. denied, 140 S. Ct. 1281 (2020) ("Miller has no relevance to sentences less than [life without parole]").

The defendant's art. 26 argument fares no better. In Commonwealth v. Concepcion, 487 Mass. 77, 86, cert. denied, 142 S. Ct. 408 (2021), we considered whether art. 26 prohibits a juvenile, convicted of murder in the first degree, from serving a sentence of life with the possibility of parole after twenty years. There, the defendant maintained that the combination of his youth and intellectual disabilities rendered his mandatory sentence disproportionate to his conviction. Id. at 86. The court concluded that the sentencing scheme, "a product of post-Diatchenko I developments in our case law," did not violate art. 26. Id. at 87-88. See Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 671 (2013) (Diatchenko I), S.C.,

471 Mass. 12 (2015). In so holding, we considered the gravity of the defendant's conviction of murder in the first degree and that art. 26, in extraordinary cases, allows a judge to sentence a juvenile to terms with parole eligibility exceeding fifteen years. Concepcion, supra at 88. See Commonwealth v. LaPlante, 482 Mass. 399, 405 (2019); Commonwealth v. Perez, 477 Mass. 677, 685-686 (2017), S.C., 480 Mass. 562 (2018). A sentence of life with the possibility of parole "would not in itself prevent [the defendant] from having 'a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" Concepcion, supra at 88-89, quoting Diatchenko I, supra at 674. A twenty-year period before a juvenile becomes eligible for parole is not so lengthy as to be the functional equivalent of life without parole. Concepcion, supra at 88.

We reach the same result in this case. The defendant's sentence to life with the possibility of parole after fifteen years does not violate rights secured by art. 26. Contrary to the defendant's argument, art. 26 does not prohibit the imposition of a mandatory sentence. Concepcion, 487 Mass. at 87. See Commonwealth v. Brown, 466 Mass. 676, 686 (2013) ("[N]either Miller nor [Diatchenko I] precludes mandatory sentencing for all juveniles in all circumstances. The holding of Miller was cabined specifically to the need for discretion in imposing the 'particular penalty' of life without parole").

The defendant's sentence provides a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Graham, 560 U.S. at 75. The effective date of his sentence was November 25, 1981, and after the reduction of his sentence to murder in the second degree, he became eligible for parole fifteen years later on November 24, 1996. He has been denied parole at least five times. See McDermott vs. Massachusetts Parole Bd., Mass. Super. Ct., No. 1985CV00788 (Worcester County Jan. 6, 2020). The defendant appealed from the April 2019 denial of his parole application, contending that the parole board failed to consider "the distinctive attributes of youth" in determining whether he was likely to reoffend. See Diatchenko v. District Attorney for the Suffolk Dist., 471 Mass. 12, 23 (2015) (Diatchenko II). The Appeals Court affirmed a Superior Court judge's allowance of the parole board's cross motion for judgment on the pleadings. See McDermott v. Massachusetts Parole Bd., 101 Mass. App. Ct. 1117 (2022). The court determined that "the full administrative record, including the transcript of the hearing before the board and the questions asked by board members, reflected a thoughtful and sufficient consideration of the [Miller and Diatchenko II] factors." Id.

Accordingly, there was no violation of either the defendant's Federal or State constitutional rights.

*Conclusion*.  The order dated May 26, 2022, denying the defendant's second motion for a new trial, is affirmed.

*So ordered*.